966 F.2d 1188
 59 Fair Empl.Prac.Cas. (BNA) 625,
59 Empl. Prac. Dec. P 41,638, 61 USLW 2143
 John L. TAYLOR and Carolyn M. Taylor,
Plaintiffs-Appellees/Cross-Appellants,
v.
WESTERN AND SOUTHERN LIFE INSURANCE COMPANY and
Western-Southern Life Assurance Company,
Defendants-Appellants/Cross-Appellees.
 Nos. 90-3859, 91-1057.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 20, 1991.
Decided July 13, 1992.
 
 Arthur J. Martin (argued) Schuchat, Cook & Werner, St. Louis, Mo., for plaintiffs-appellants.
 Richard J. Pautler, Bradley S. Hiles (argued), Mary Tonkin, Peper, Martin, Ensen, Maichel & Hetlage, St. Louis, Mo., for defendants-appellees.
 Before BAUER, Chief Judge, RIPPLE, Circuit Judge, and FAIRCHILD, Senior Circuit Judge.
 RIPPLE, Circuit Judge.
 
 
 1
 John Taylor and Carolyn Taylor, husband and wife, each sold life insurance as employees of Western and Southern Life Insurance Company and Western-Southern Life Assurance Company (collectively "Western-Southern"). After a series of racially discriminatory incidents, Mrs. Taylor was fired and Mr. Taylor resigned. Mr. Taylor filed a race discrimination claim with the EEOC and received a right to sue letter. Together, Mr. and Mrs. Taylor brought suit against Western-Southern, alleging that the conditions of their employment and termination violated 42 U.S.C. § 1981, constituted breach of contract and wrongful discharge, and, with respect to Mr. Taylor, violated Title VII of the 1964 Civil Rights Act. On April 6, 1989, the district court granted Western-Southern's 12(b)(6) motion to dismiss the section 1981, breach of contract, and wrongful discharge claims as barred by a six-month limitation-of-actions period in the Taylors' employment contracts. On May 9, 1990, after a bench trial, the district court ruled in favor of Mr. Taylor on his Title VII claim against Western-Southern. On December 3, 1990, after a hearing on damages, the district court entered final judgment in favor of Mr. Taylor on the Title VII claim. Western-Southern appeals from the court's judgment in favor of Mr. Taylor's Title VII claim, and Mr. and Mrs. Taylor cross-appeal from the court's judgment dismissing their section 1981 claims. For the following reasons, we affirm in part and vacate and remand in part.
 
 
 2
 * BACKGROUND
 
 A. Facts
 
 3
 On December 8, 1980, Western-Southern hired Mr. Taylor, a black man, as a sales representative assigned to the Peoria office. Mr. Taylor signed an employment contract that contained the following limitation of actions clause:
 
 Section III. Legal Proceedings
 You agree:
 
 4
 C. Not to commence any action or suit relating to your employment with Western-Southern more than six months after the date of termination of such employment, and to waive any statute of limitation to the contrary.
 
 
 5
 R.1 Ex.A at 2. Mr. Taylor was at the time, and continues to be, married to Mrs. Taylor, a white woman. During the entire time Mr. Taylor worked in the Peoria district, he was the only black employee of Western-Southern in the district.
 
 
 6
 Mr. Taylor performed well as a sales agent and, in October 1981, was promoted to sales manager. In 1982, Jack O'Neal was assigned as the new district manager in the Peoria district office; O'Neal became Mr. Taylor's immediate boss. During the first week of O'Neal's directorship, O'Neal said to Mr. Taylor, "[Y]ou are all right because I know you are married to a white." Tr.I at 43. Soon thereafter, however, O'Neal called Mr. Taylor into his office and accused him of lying about having worked a full day the previous day. While displaying a gun, O'Neal told Mr. Taylor, "I'm the boss ... don't come in here lying to me again" (Tr.I-44). After several further unpleasant exchanges with O'Neal, Mr. Taylor asked to be demoted from his position as sales manager, and to resume his original job as sales representative, in order to avoid having direct contact with O'Neal. On June 2, 1982, Mr. Taylor stepped down. The associate sales manager position vacated by Mr. Taylor was immediately filled by a white agent who was a friend of O'Neal's.
 
 
 7
 O'Neal continued his abusive acts. He told racist jokes at work, including one which Mrs. Taylor overheard that ended with the punch line, "[M]ay all your babies be white." Tr.I at 175. In October 1982, during a sales promotion in which agents paired up to sell insurance as teams, O'Neal arranged to have Mr. Taylor as his partner for a day. Riding together in O'Neal's car, O'Neal asked Mr. Taylor if he minded stopping by O'Neal's house for a moment. Mr. Taylor agreed, and accompanied O'Neal into his house, where O'Neal pulled a chair back from the kitchen table and told Mr. Taylor to have a seat while he got something from another room. Mr. Taylor sat down and was reading a magazine when, a minute later, O'Neal returned with a handgun which he turned on Mr. Taylor. Over the next several moments, O'Neal placed the gun to Mr. Taylor's temple and held it there while he triggered a flash camera to take a series of photographs. O'Neal then backed off and said, "John, I was just playing with you." Tr.I at 57. At Mr. Taylor's request, O'Neal drove Mr. Taylor back to the office. A week later, at the office staff meeting, O'Neal passed the photographs around the office saying, "[T]his is what a nigger looks like with a gun to his head." Tr.I at 60. After Mrs. Taylor was hired as a sales representative in the same office, O'Neal asked the Taylors to join him and assistant vice president Max Pearson at a bar in Peoria. At the bar, Pearson fondled Mrs. Taylor's leg in a manner that embarrassed Mrs. Taylor and angered Mr. Taylor. Tr.I at 62-63.
 
 
 8
 Mr. Taylor complained about O'Neal to Lester Rafferty, who had been the district manager and Mr. Taylor's immediate boss, but was demoted when O'Neal was transferred in as district manager. Rafferty suggested to Mr. Taylor that he talk with divisional vice president Charles Douglas, who also is black. Mr. Taylor later had a long discussion with Douglas, who responded that he had always known that O'Neal was a racist and that he would try to get Mr. Taylor transferred to another office. In the spring of 1983, Douglas told Mr. Taylor that he had a position available for him in East St. Louis. In July 1983, Max Pearson met with Mr. Taylor and explained that the sales manager's position on the East St. Louis staff was a good opportunity for Mr. Taylor, particularly because everyone on the East St. Louis staff was black. Douglas also informed Frank Harp, the district manager of the East St. Louis office, that Mr. Taylor was black and that he was married to a white woman. According to Douglas, he told Harp this because "I didn't want to have a lot of turmoil and problems when transferring a family like this." Tr.II at 117.
 
 
 9
 Mr. Taylor and Mrs. Taylor were both from Peoria and had family still living there. Nevertheless, in July 1983, the Taylors transferred to East St. Louis, and Mr. Taylor took the position of associate sales manager of the East St. Louis staff.[1] Despite Pearson's characterization of the East St. Louis post as a good career opportunity, Mr. Taylor soon discovered that there were serious problems with the staff for which he became responsible. Some of the agents had been defrauding the company by submitting bogus policies. Other agents had been defrauding customers by pocketing premiums and allowing policies to lapse. Several agents had to be fired after Mr. Taylor discovered that money was missing from their accounts. In addition, Mr. Taylor learned first-hand that the East St. Louis neighborhoods were dangerous to service; while he and a fellow agent were making a sales call, a homeowner displayed a gun and told them that if they ever came back he would kill them. Tr.I at 76.
 
 
 10
 As associate manager, Mr. Taylor's income depended upon the success of the agents he managed. While he had some success turning the East St. Louis staff around, he was earning less as a manager than he knew he could as an agent. After eight months as associate sales manager, he sought demotion to sales representative. In July 1984, he learned of a sales manager's opening on the Alton staff, which was part of the East St. Louis District but worked out of a detached office nearby. Mr. Taylor asked Douglas to be promoted and transferred to the associate sales manager on the Alton staff. Douglas told Mr. Taylor that there might be a problem assigning him to the position because the Alton staff was all white. At Douglas' direction, East St. Louis district manager Frank Harp held a meeting with the Alton sales staff, at which he asked each agent if they would have a problem being managed by Mr. Taylor. No one objected, and Mr. Taylor moved into the position of sales manager on the Alton staff on August 6, 1984.
 
 
 11
 For the remainder of 1984 and the first few months of 1985, things in the Alton office went very well. In late 1984, while Douglas was visiting offices in the St. Louis area, he met with Mr. Taylor and Harp and discussed, among other things, Mr. Taylor's success. Mr. Taylor inquired about his chances of becoming a district manager or otherwise advancing with Western-Southern. At one point in the conversation, after Harp had stepped away for a moment, Douglas told Mr. Taylor that his chances for advancement were limited because he was married to a white woman.
 
 
 12
 In July 1985, the president and the executive vice president of Western-Southern visited the area. At this time, Mrs. Taylor had transferred to the Alton staff and was working as a sales representative. When they visited the Alton office, the president and the executive vice president were introduced first to Mr. Taylor, as the manager, and then to Mrs. Taylor, as his wife and one of the agents, and then to each of the other agents. Sometime thereafter, Western-Southern republished a rule--which had been ignored for over ten years--against family members working together in the same office. Around the same time, Douglas convinced Mrs. Taylor to change from her position as a debit agent, which involved collecting monthly premiums from existing accounts and drawing new business from friends and associates of existing clients, to a new position the company had created, an "ordinary agent," which involved pure sales--mostly cold calls--rather than collecting on and maintaining accounts. Douglas told Mrs. Taylor that, as an ordinary agent, she would have more flexibility and could spend more time with her children. It also meant that she would no longer report directly to Mr. Taylor, but would report instead to district manager Harp. Finally, Harp pointed out to Mrs. Taylor that the last paragraph in the contract reserved to her the right to transfer back to a position as a debit agent if the position as an ordinary agent did not work out. Mrs. Taylor was reluctant but, after considerable pressure, agreed to change positions.
 
 
 13
 In November 1985, Mr. Taylor learned of another opportunity for advancement--this time to a position as field manager consultant, which would involve troubleshooting for several offices. The position of field manager consultant was considered to be an alternative path for promotion to district manager. Mr. Taylor submitted to district manager Harp a request for a promotion to field manager consultant. A month later, when Douglas was in town, Harp called Mr. Taylor into his office. Harp held up the letter that Mr. Taylor had submitted to him and said that the purpose of the meeting was to talk about the letter. Mr. Taylor's immediate response was, "Mr. Harp, that letter should have been sent a month ago." Tr.I at 103. Douglas told Mr. Taylor that it would not do any good, because he would simply block such an appointment. Soon after this meeting, Mr. Taylor stepped down from the sales manager position in Alton and once again became a sales representative. At trial, both Harp and Douglas denied that they blocked the appointment. Both said that they interpreted the job requirement "two years service as associate sales manager" to include two years' consecutive experience as an associate sales manager and that Mr. Taylor simply did not meet this criterion. (While Mr. Taylor had over two years experience at the position, it was not consecutive.)
 
 
 14
 Although Mrs. Taylor had been successful as a debit agent, she performed poorly as an ordinary agent. Mr. Taylor learned that Jack O'Neal had been moved out of the Peoria office, so Mr. Taylor began to inquire whether he and Mrs. Taylor could transfer back there. In January 1986, Mr. Taylor called Lester Rafferty, an associate sales manager in the Peoria office who was also a friend of the Taylors. Rafferty talked to the district manager in the Peoria office, who called Mr. Taylor and told him that they had two positions available in the Peoria and Bloomington offices to which Mr. and Mrs. Taylor could transfer. Mr. and Mrs. Taylor then drafted a single letter, signed it together, and presented it to Harp and Douglas one day while Douglas was visiting the office. Harp and Douglas told the Taylors that neither of them had a strong enough record to justify a transfer. At this point, Mr. Taylor called the home office and asked to speak to someone higher in management than Douglas. Mr. Taylor could not get through to speak with anyone. However, Douglas learned of Mr. Taylor's attempt and called Mr. Taylor at home to talk about it. Mr. Taylor told Douglas that he called to complain about being blocked from advancement. Douglas told Mr. Taylor that, as he had said before, Mr. Taylor had no chance for advancement within Western-Southern so long as he was married to a white woman. Tr. I at 111.
 
 
 15
 In April 1986, Mrs. Taylor sought reappointment as a sales representative (a "debit agent"), pursuant to the out clause in her contract, but Douglas denied the request because of her poor performance as an ordinary agent. In May 1986, Harp demanded and received Mrs. Taylor's resignation. Mr. Taylor performed well throughout most of 1986; he was one of the most productive agents in the East St. Louis District Office. However, several times between August and November, Harp called Mr. Taylor into his office and complained about Mr. Taylor's production. While Mr. Taylor disputed Harp's criticism, he became discouraged. From November 1986 through January 1987, Mr. Taylor's production declined steadily. On January 28, 1987, Mr. Taylor again sought transfer to Peoria, but Harp refused, stating that Mr. Taylor had a poor record. On February 4, 1987, Mr. Taylor submitted his letter of resignation, effective February 27, 1987. In the letter, Mr. Taylor said, "I have enjoyed my years that I have been employed at Western and Southern." On May 9, 1987, Mr. Taylor filed a charge of race discrimination with the EEOC. On March 16, 1988, the EEOC issued to Mr. Taylor a right to sue letter.
 
 B. District Court Proceedings
 
 16
 On June 15, 1988, Mr. and Mrs. Taylor filed a five-count complaint against Western-Southern in district court. The first two counts alleged that Western-Southern violated 42 U.S.C. § 1981 when it intentionally discriminated against Mr. Taylor (count I) and Mrs. Taylor (count II) with respect to transfer, promotion, and conditions of employment. The next two counts alleged that Western-Southern breached its employment agreement with Mr. Taylor (count III) and Mrs. Taylor (count IV) when it constructively discharged them because of their race. The final count (count V) alleged that Western-Southern violated Title VII when it constructively discharged Mr. Taylor because of his race.
 
 
 17
 On April 6, 1989, the district court granted Western-Southern's 12(b)(6) motion to dismiss the section 1981, breach of contract, and wrongful discharge claims as barred by the six-month limitation-of-actions clause in the Taylors' employment contracts. The district court held that the limitations clause was valid under Illinois law, and that the clause was reasonable and not contrary to public policy. Because more than six months passed between the Taylors' terminations of employment and their suit against Western-Southern, the court ruled that the limitations clause barred the first four counts in the complaint.[2]
 
 
 18
 On May 9, 1990, after a bench trial, the district court ruled in favor of Mr. Taylor on his Title VII constructive discharge claim against Western-Southern. The district court began its reasoning with the premise, "To establish constructive discharge, an employee who resigns must establish that he was confronted with an aggravated situation beyond the fact of ordinary discrimination on the job." Memorandum and Order of May 9, 1990, (R.34) at 16. The court then noted that "[a] pattern of discriminatory treatment over time has been held to create the necessary aggravating circumstances." Id. The district court then listed nine events in the Peoria office and twelve events in the St. Louis office which the court held constituted a pattern of intentionally discriminatory treatment and an aggravated situation beyond ordinary discrimination. The court concluded that this aggravated situation compelled Mr. Taylor to quit involuntarily and, thus, Mr. Taylor was constructively discharged in violation of Title VII.
 
 II
 ANALYSIS
 
 19
 Western-Southern appeals the district court's verdict, following a bench trial, in favor of Mr. Taylor on his Title VII claim. Mr. and Mrs. Taylor cross-appeal the district court's grant of summary judgment in favor of Western-Southern on the grounds that the six-month limitation of actions clause in their employment contracts barred their claims under 42 U.S.C. § 1981. We address Western-Southern's appeal first, then turn to the Taylors' cross-appeal.
 
 A. Western-Southern's Appeal
 
 20
 Mr. Taylor's Title VII claim was tried to the bench, and the court entered findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a). While we review the court's findings of fact under a clearly erroneous standard, we review the court's legal conclusions de novo. Pullman-Standard v. Swint, 456 U.S. 273, 287-90, 102 S.Ct. 1781, 1789-90, 72 L.Ed.2d 66 (1982); Forum Corp. of N. America v. Forum, Ltd., 903 F.2d 434, 438 (7th Cir.1990); Jennings v. Tinley Park Community Consol. Sch. Dist. No. 146, 864 F.2d 1368, 1373 (7th Cir.1988).
 
 
 21
 Western-Southern raises two primary challenges to the district court's legal conclusions. Western-Southern alleges that the district court, in concluding that Western-Southern constructively discharged Mr. Taylor in violation of Title VII, impermissibly relied upon (1) alleged acts that were not "like or reasonable related to" the violations alleged in Mr. Taylor's EEOC charge, and (2) alleged acts that are wholly unrelated to Mr. Taylor's race and/or interracial marriage. Western-Southern also challenges several of the district court's findings of fact as unsupported or contrary to the evidence.
 
 1. Like or reasonably related
 
 22
 Western-Southern properly notes, "As a general rule, Title VII plaintiffs cannot bring claims in a lawsuit that were not included in their EEOC charge." Appellant's Br. at 22. In Jenkins v. Blue Cross Mutual Hospital Insurance, Inc., 538 F.2d 164 (7th Cir.) (en banc), cert. denied, 429 U.S. 986, 97 S.Ct. 506, 50 L.Ed.2d 598 (1976), this court adopted the standard that the Fifth Circuit had set forth in Danner v. Phillips Petroleum Co., 447 F.2d 159, 162 (5th Cir.1971):
 
 
 23
 "The correct rule to follow in construing EEOC charges for purposes of delineating the proper scope of a subsequent judicial inquiry is that 'the complaint in the civil action ... may properly encompass any ... discrimination like or reasonably related to the allegations of the charge and growing out of such allegations.' "
 
 
 24
 Jenkins, 538 F.2d at 167 (quoting Danner ). The reason behind this requirement is to give the EEOC " 'an opportunity to settle disputes through conference, conciliation, and persuasion before the aggrieved party [is] permitted to file a lawsuit,' " Babrocky v. Jewel Food Co., 773 F.2d 857, 863 (7th Cir.1985) (quoting Alexander v. Gardener-Denver Co., 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974)), as well as to put defendants on notice of the substance of the charge. Schnellbaecher v. Baskin Clothing Co., 887 F.2d 124, 127 (7th Cir.1989) ("[T]he reason behind the requirement that allegations not contained in an EEOC charge cannot be contained in the complaint is that the defendant must have notice of the charge, and the EEOC must have the opportunity to investigate and conciliate the charge, in order to attempt to obtain voluntary compliance with Title VII."). See also Rush v. McDonald's Corp., 966 F.2d 1104, 1110 (7th Cir.1992).
 
 
 25
 Nevertheless, Jenkins does not require a Title VII plaintiff to allege in an EEOC charge each and every fact that combines to form the basis of each claim. Indeed, this court has been charitable in applying the Jenkins standard because it recognizes that most EEOC complaints are completed by laypersons rather than lawyers.
 
 
 26
 "[T]he Civil Rights Act is designed to protect those who are least able to help themselves. Complainants to the EEOC are seldom lawyers. To compel the charging party to specifically articulate in a charge filed with the Commission the full panoply of discrimination which he may have suffered may cause the very persons Title VII was designed to protect to lose that protection because they are ignorant of or unable to thoroughly describe the discriminatory practices to which they are subjected...."
 
 
 27
 Jenkins, 538 F.2d at 168 (quoting Willis v. Chicago Extruded Metals Co., 375 F.Supp. 362, 365-66 (N.D.Ill.1974)). This court has held that Title VII is to "be construed and applied broadly," and that "[a] single charge may 'launch a full scale inquiry' " into racial discrimination. Motorola, Inc. v. McLain, 484 F.2d 1339, 1344, 1346 (7th Cir.1973) (quoting Jenkins v. United Gas Corp., 400 F.2d 28, 33 (5th Cir.1968)), cert. denied, 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 287 (1974); Babrocky, 773 F.2d at 864 ("The standard is a liberal one in order to effectuate the remedial purposes of Title VII, which itself depends on lay persons, often unschooled, to enforce its provisions."); see also Rush, 966 F.2d at 1111.
 
 
 28
 Mr. Taylor's EEOC charge referred only to specific events which took place in the East St. Louis office in and after November 1985.[3] The issue under Jenkins is whether the discriminatory acts in the Peoria office involving Jack O'Neal--which the court clearly relied upon in concluding that Mr. Taylor was confronted with an aggravated situation beyond ordinary discrimination[4]--are "like or reasonably related to the allegations of the charge and growing out of such allegations" to be properly included in the lawsuit.
 
 
 29
 Mr. Taylor contends that the events in Peoria are reasonably related to the events in East St. Louis for two reasons. First, Mr. Taylor points to the actions of divisional vice president Douglas, who was Taylor's ultimate supervisor at both the Peoria office and the East St. Louis office. Appellee's Br. at 31-32. Douglas responded to Jack O'Neal's discrimination against Mr. Taylor in Peoria by transferring Mr. Taylor to East St. Louis. Douglas, who also happens to be a black man, told Mr. Taylor that the move to East St. Louis was a good opportunity and that the staff was all black. When Mr. Taylor tried to transfer back to Peoria after O'Neal left that office, Douglas blocked the transfer. Douglas also told Mr. Taylor that there might be a problem transferring to the Alton office as a sales manager because the staff was all white. On more than one occasion Douglas told Mr. Taylor that Mr. Taylor's interracial marriage would impede his advancement. Thus, Mr. Taylor argues, the events in Peoria involving Douglas are reasonably related to the events in East St. Louis involving Douglas.
 
 
 30
 Second, Mr. Taylor contends that the events in Peoria are reasonably related to the events in East St. Louis because the Peoria discrimination contributed to the pattern of discrimination which, after the events in East St. Louis, caused him reasonably to conclude that he was compelled to resign. While Mr. Taylor was not seeking recovery for the specific acts of discrimination which occurred in Peoria in 1982, he sought to establish the fact that those acts occurred in order to support the reasonableness, in East St. Louis in 1987, of his feeling compelled to resign.
 
 
 31
 Western-Southern argues that when the district court looked this far back and beyond the scope of the EEOC charge, it erroneously applied the "continuing violation" theory of race discrimination. Appellant's Br. at 26. But the "continuing violation" analysis to which Western-Southern refers is utilized only in the context of a challenge to the timeliness of a cause of action. See, e.g., Davidson v. Indiana-American Water Works, 953 F.2d 1058, 1060 (7th Cir.1992); Young v. Will County Dep't of Public Aid, 882 F.2d 290, 292 (7th Cir.1989). Because Western-Southern never challenged the timeliness of Mr. Taylor's Title VII claim, the court had no reason to consider the "continuing violation" theory of tolling. Rather, the court was considering whether the evidence supported Mr. Taylor's theory that a continuing pattern of discrimination existed as background to justify his decision to resign.
 
 
 32
 We agree with the district court that Mr. Taylor could properly offer evidence concerning events not included in the EEOC charge--specifically the acts of Jack O'Neal and Charles Douglas in the Peoria office--as background evidence in order to meet his burden of proving that he was reasonable in concluding that he was compelled to resign. The discrimination that occurred in Peoria is sufficiently "like or reasonably related to" the discrimination in East St. Louis to be introduced for this purpose. We do not intend by this holding to suggest that the Peoria events were sufficiently related to the East St. Louis events to allow Mr. Taylor to have brought suit and sought relief on separate discrimination charges for the events in Peoria. Mr. Taylor is seeking relief only for the ultimate actions which occurred in East St. Louis and were the subject of his EEOC charge. We hold only that the earlier events are sufficiently related to the later events to allow Mr. Taylor to utilize them as background facts to meet his burden of proof that he was reasonable in interpreting the later events as discriminatory and compelling him to resign.
 
 
 33
 2. Events that are "wholly unrelated" to Mr. Taylor's race and/or interracial marriage
 
 
 34
 Western-Southern also contends that, among the events upon which the district court relied in finding a pattern of discriminatory treatment, the court improperly considered alleged acts that are wholly unrelated to Mr. Taylor's race and/or interracial marriage. Appellant's Br. at 33-38. Specifically, Western-Southern objects to the district court's reliance on evidence about Mrs. Taylor's employment with Western-Southern, evidence about Western-Southern's republication of the rule barring family members from working together, and evidence about Douglas' and Harp's interpretation of the two-year experience requirement for promotion to field management consultant. We believe that the district court was entitled to consider these events in assessing Mr. Taylor's charge of racial discrimination.
 
 
 35
 First, Western-Southern contends that there is no evidence linking the treatment that Mrs. Taylor received in her employment at Western-Southern with the alleged discrimination against Mr. Taylor. In response, Mr. Taylor argues that it is logical to infer that Western-Southern's negative treatment of Mrs. Taylor was a result of her marriage to Mr. Taylor, especially in light of the comments that Douglas made to Mr. Taylor about the difficulty he would encounter being married to a white woman.[5] We believe that it was within the district court's discretion to draw the relevant inference. Second, Western-Southern contends that there was no evidence offered at trial to support the district court's conclusion that the rule prohibiting family members from working together in the same office was republished "shortly" after the company president visited the Alton office and met the Taylors. Indeed, Western-Southern argues, both Harp and Douglas testified that there was no relationship between the republication of the rule and the president having met the Taylors. In response, Mr. Taylor contends that both Harp and Douglas conceded that the rule was republished after the company president visited the Alton office in July 1985 and before Mrs. Taylor was discharged in May 1986. Mr. Taylor also notes that vice president Douglas worked out of the home office and was one of the executives in close contact with the company president. Thus, Douglas' statement that the Taylors' interracial marriage was, in the company's view, a problem suggests that the republication of the rule by the home office was indeed related to the president's learning that Mr. and Mrs. Taylor worked together. We find that the district court was entitled to characterize the republication of the rule as it did. Third, Western-Southern contends that the district court improperly inferred that Harp and Douglas were dishonest when they testified that they did not support Mr. Taylor's request for promotion to field manager consultant because they thought a prerequisite for the job was two years' consecutive experience as an associate sales manager, rather than because of racial bias. Here, again, we believe the district court, sitting as trier of fact, was entitled to assess, on the basis of the testimony presented, the true motivation of the company's executives.
 
 
 36
 3. Sufficiency of evidence supporting the district court's findings of fact
 
 
 37
 Western-Southern challenges several of the district court's findings of fact as unsupported or contrary to the evidence. In general, Western-Southern contends that, on several issues where evidence offered by the Taylors was contradicted by evidence offered by Western-Southern, the district court credited the Taylors' testimony and discredited the testimony of Western-Southern's witnesses. On this issue, this court has held:
 
 
 38
 Appellate review of credibility determinations is severely limited. We shall reject a district judge's decision to believe oral testimony only where the testimony is seriously inconsistent internally, or contrary to established laws of nature or otherwise fantastic, or irreconcilably in conflict with indubitable documentary or physical evidence, stipulations of fact, admissions, or evidence of equivalent certainty. See Anderson v. City of Bessemer City, 470 U.S. 564, 575 [105 S.Ct. 1504, 1512, 84 L.Ed.2d 518] (1985).
 
 
 39
 Bullard v. Sercon Corp., 846 F.2d 463, 466 (7th Cir.1988). Because our review of the trial transcript reveals no glaring inconsistencies or fantastic exaggerations in the testimony of Mr. Taylor and Mrs. Taylor, we reject this generalized challenge to the district court's credibility determinations.
 
 
 40
 More specifically, Western-Southern challenges several of the district court's fact-based findings. First, Western-Southern challenges the district court's finding that Charles Douglas made a point to mention to Mr. Taylor that the East St. Louis staff was all black. R.34 at 18. Western-Southern contends that the only testimony in support of this finding was Douglas' admission on cross-examination that he "may have" told Mr. Taylor that the staff was black. In response, Mr. Taylor contends that "it is uncontradicted" that Douglas' assistant, Max Pearson, made such a statement to Mr. Taylor. Indeed, one of the district court's findings of fact was that Pearson, rather than Douglas, told Mr. Taylor that the East St. Louis staff was all black. Thus, Western-Southern is correct that the district court erred. However, the court's error was simply that, in restating its finding, it attributed this remark to vice president Douglas rather than to assistant vice president Pearson. We do not believe that this matter can be considered outcome-determinative.
 
 
 41
 Second, Western-Southern challenges the district court's finding that Douglas and Harp criticized Mr. Taylor for his performance in 1986 even though his performance did not falter until November of that year. R.34 at 20. Western-Southern points to the EEOC charge, where Mr. Taylor asserted that the negative criticism began around November 1986. Mr. Taylor responds that he testified at trial that the criticism began around August 1986, and Douglas admitted on cross-examination that he probably criticized Mr. Taylor throughout 1986. The district court's finding was not clearly erroneous.
 
 
 42
 Third, Western-Southern challenges the district court's finding that Mrs. Taylor applied for, and was denied, the position of associate sales manager at the Alton office. R.34 at 11. Western-Southern points out that Mrs. Taylor testified at trial that she never formally applied for this job, but only telephoned Frank Harp and told him she was interested in and would like to be considered for the position. Given the vagueness of the phrase "applied for," and given the fact that it is undisputed that, within hours of Mrs. Taylor's phone call to Frank Harp, Harp returned Mrs. Taylor's call and told her that the position was filled, we do not find that the court was clearly erroneous in concluding that Mrs. Taylor had applied for the position.
 
 
 43
 Fourth, Western-Southern contends that the district court erred in listing as an event "which took place" and "support[s] a finding of aggravating circumstances" the fact that O'Neal "used racial epithets and slurs involving the word 'nigger' in the presence of [Mr. Taylor and Mrs. Taylor] during work hours when [Mr. Taylor] was the only black employee ... in the Peoria office." R.34 at 16-17. Western-Southern argues that the only slur testified to was the one-time use of the word nigger in connection with the gun-photograph incident and, thus, the court's finding of this "event" improperly suggests that racial slurs were commonplace at the Peoria office. Yet, as Mr. Taylor notes, Mrs. Taylor testified that O'Neal often told jokes derogatory of blacks including one with the punch line, "[M]ay all your babies be white." Tr.I at 175. And Mr. Taylor testified that when O'Neal first took over the Peoria office, O'Neal told Mr. Taylor, "[Y]ou are all right because I know you are married to a white." Tr.I at 43. Again, the district court's finding is not clearly erroneous.
 
 
 44
 Fifth, Western-Southern challenges the court's listing as an event "which took place" and "support[s] a finding of aggravating circumstances" that Douglas and Harp conspired to convince Mrs. Taylor to work as an ordinary agent and then reneged on their promise to let her return to a sales representative position. R.34 at 19. In response, Mr. Taylor contends that the contract clearly had a provision to allow Mrs. Taylor to return to a position as sales representative, and Mrs. Taylor was assured that she could return to that position at will. Furthermore, before Mrs. Taylor was discharged from her position as ordinary agent, she did seek to be reinstated as a debit agent. According to Mrs. Taylor's testimony, Harp denied that request. Tr.I at 196-97. Again, the district court's finding was not clearly erroneous.
 
 
 45
 We conclude that the district court's factual findings are sound. Western-Southern raises minor errors--such as the court's use of the name Douglas when it meant Pearson--as grounds for reversal. Considering that the court made over fifty findings of fact and relied upon twenty-one in concluding that aggravated circumstances existed, we do not believe that such errors are significant enough to affect the outcome of the case. There is considerable evidence to support the district court's conclusions that Western-Southern repeatedly discriminated against Mr. Taylor based upon his race and interracial marriage and that this pattern of discrimination caused Mr. Taylor to feel compelled to resign.
 
 B. The Taylors' Cross-Appeal
 
 46
 The first two counts of the Taylors' complaint against Western-Southern alleged that the company violated 42 U.S.C. § 1981 when it intentionally discriminated against Mr. Taylor (count I) and Mrs. Taylor (count II) with respect to transfer, promotion, and conditions of employment. On April 9, 1989, the district court granted Western-Southern's motion to dismiss these counts on the ground that they were barred by the following clause in each of the Taylors' written employment agreements:
 
 Section III. Legal Proceedings
 You agree:
 
 47
 C. Not to commence any action or suit relating to your employment with Western-Southern more than six months after the date of termination of such employment, and to waive any statute of limitation to the contrary.
 
 
 48
 R.1 Ex.A at 2. On cross-appeal, the Taylors argue that the district court erred in dismissing their section 1981 counts. The Taylors face two hurdles on appeal: (1) surviving Patterson v. McLean Credit Union, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989); and (2) proving invalid or avoiding the scope of the limitation of actions clause in their employment agreements.
 
 1. The impact of Patterson
 
 49
 Two months after the district court's ruling on this matter, on June 15, 1989, the Supreme Court ruled in Patterson that 42 U.S.C. § 1981 does not apply to racial discrimination under or within the terms of an employment contract. This court held in McKnight v. General Motors Corp., 908 F.2d 104, 107-08 (7th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 1306, 113 L.Ed.2d 241 (1991), that Patterson applies retroactively to cases, such as this one, pending on appeal. On November 21, 1991, after oral argument in this case, Congress enacted the Civil Rights Act of 1991 and thereby overruled the relevant portion of Patterson. See Pub.L. No. 102-166, § 101(2), 105 Stat. 1071-72 (adding, in relevant part, a new subsection that defines broadly the phrase "make and enforce contracts" as subsection (b) to section 1981). This court recently ruled, however, that the Civil Rights Act of 1991 does not apply retroactively to cases such as this one. Mozee v. American Commercial Marine Serv. Co., 963 F.2d 929 (7th Cir.1992); see also Luddington v. Indiana Bell Tel. Co., 966 F.2d 225 (7th Cir.1992) (reaching same result). Thus, this case is one of a vanishing breed to which we must apply the Patterson standards. Unfortunately, the parties never had the opportunity to develop the record from this perspective.
 
 
 50
 Under Patterson, section 1981 prohibits only discrimination in the initial formation of a contract or in the enforcement of established contractual rights through legal processes. 491 U.S. at 176-77, 109 S.Ct. at 2372-73. Thus, Patterson effectively bars those portions of the Taylors' section 1981 claims dealing with the terms and conditions of their employment. Because promotions are similar to the creation of new contracts, however, Patterson noted that claims of discriminatory failure to promote may be actionable under section 1981 if
 
 
 51
 the nature of the change in position was such that it involved the opportunity to enter into a new contract with the employer.... Only where the promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer is such a claim actionable under § 1981.
 
 
 52
 491 U.S. at 185, 109 S.Ct. at 2376. Thus, in order for this court to determine whether the Taylors' discriminatory refusal to promote claims survive Patterson, we must determine whether the promotions sought by the Taylors were opportunities for new and distinct relationships with Western-Southern.
 
 
 53
 As this court has noted on several occasions, the "new and distinct relation" standard is difficult to apply. Partee v. Metropolitan Sch. Dist., 954 F.2d 454, 457 (7th Cir. January 21, 1992) (acknowledging that this court has "expressed some uncertainty as to the precise meaning of Patterson 's 'new and distinct relation' test"); McKnight, 908 F.2d at 109-10 (noting that "the question of what constitutes a new employment relation under Patterson is difficult and unsettled"); Malhotra v. Cotter & Co., 885 F.2d 1305, 1312 (7th Cir.1989) ("We show no disrespect to the Supreme Court by suggesting that the scope of Patterson is uncertain."). Indeed, we have remarked that there is no simple, bright-line test to apply. McKnight, 908 F.2d at 109 ("Precisely how different the new employment relation must be to make a racially motivated refusal to create it actionable under section 1981 is not susceptible of a blanket answer....").
 
 
 54
 Nonetheless, despite the absence of a definitive framework, a substantial body of law has developed among the circuits to provide adequate guideposts. In Sitgraves v. Allied-Signal, Inc., 953 F.2d 570, 573 (9th Cir.1992), the Ninth Circuit stated that "in addition to an increase in pay and duties, an actionable promotion claim must involve a meaningful, qualitative change in the contractual relationship." That court also found two qualitative changes that were sufficient to meet the standard:
 
 
 55
 We conclude that the move from a non-supervisory position to a supervisory one is therefore an actionable basis for a section 1981 failure-to-promote claim under Patterson's "new and distinct relation" test. Similarly we conclude that the move from compensation based on hours worked to compensation based on an annual salary constitutes a sufficiently new and different contractual relationship to provide an actionable promotion claim.
 
 
 56
 Sitgraves, 953 F.2d at 574. In Harrison v. Associates Corp. of North America, 917 F.2d 195, 198 (5th Cir.1990), the Fifth Circuit stated that an increase in pay, by itself, is not enough: "Although a raise in salary which accompanies a change in position is evidence of a new and distinct relation, a raise which is accompanied by no significant change in duties and responsibilities does not reach the level of a change in employment relationship protected by § 1981." For this reason, the Harrison court found that a promotion from C.R.T. operator to lead C.R.T. operator--a promotion that involved an increase in pay but not an addition in general supervisory responsibility--did not result in a new and distinct relationship. Id.; see also Fray v. Omaha World Herald Co., 960 F.2d 1370, 1373 (8th Cir.1992) (finding change from part-time mailroom production worker to mailroom apprentice insufficient; "[E]ach step down the path of one's career does not create a new and distinct relation with the employer for purposes of the Patterson test."); Wall v. Trust Co., 946 F.2d 805, 808 (11th Cir.1991) (finding change from customer service representative to tax analyst insufficient; suggesting that an elevation from non-management to management would meet the standard); Bennun v. Rutgers State Univ., 941 F.2d 154, 168-70 (3d Cir.1991) (finding promotion from tenured associate professor to full professor insufficient; downplaying difference in prestige or public perception and focusing on duties, tenure, compensation, and essential function), cert. denied, --- U.S. ----, 112 S.Ct. 956, 117 L.Ed.2d 124 (1992); Rountree v. Fairfax County Sch. Bd., 933 F.2d 219, 223-25 (4th Cir.1991) (finding change from career level I to career level II teacher insufficient; level of responsibility remaining roughly the same); Mallory v. Booth Refrigeration Supply Co., 882 F.2d 908, 911 (4th Cir.1989) (finding promotion from clerk to supervisor sufficient). In general, we note the emphasis placed upon qualitative, rather than quantitative, changes--e.g., while an increase in pay may not suffice, a change from hourly pay to monthly salary may.
 
 
 57
 In applying these principles to this case, it is evident that some of the factors that have prompted other courts to find a new and distinct contractual relationship are present here. Although the record does not contain a contract for the field management consultant position sought by Mr. Taylor, the job description of that position reveals that it would entail a shift from commission-based compensation to a weekly salary. Sales Manager's Agreement, Pl. Ex. 15 at 2-3; Job Description, Def. Ex. 20 at 4. Similarly, the promotion sought by Mrs. Taylor, from sales agent to associate sales manager, would entail a shift from non-supervisory to supervisory responsibilities. Sales Representative's Agreement, Pl. Ex. 42 at 2; Sales Manager's Agreement, Pl. Ex. 15 at 2.
 
 
 58
 Nonetheless, the parties did not conduct discovery or develop the record with this Patterson analysis in mind. For this reason, the comparisons between the positions held by Mr. and Mrs. Taylor and the positions they sought are less than full and accurate. We note that other courts of appeals faced with this situation have required further development of the record. See, e.g., Weaver v. Casa Gallardo, Inc., 922 F.2d 1515, 1520 (11th Cir.1991); Rodriguez v. General Motors Corp., 904 F.2d 531, 534-35 (9th Cir.1990). This court did so in Malhotra, 885 F.2d at 1311-12. There are several reasons for similar circumspection in this case. First, each of the agreements contained in the record states, on its face, that the named employee is "appointed" to a certain position. It is not clear from this language whether these appointments presume the existence of an underlying employer-employee contract, such that the appointment agreement is simply a way of communicating to the employee the company's expectations of a person holding the position. Second, Mr. Taylor's career path, with all of the upward and downward shifts between positions, suggests that there may be a great deal of bi-directional fluidity in the occupation, in contrast to the typical ascending-step promotional scheme. Third, it is not clear whether Western-Southern uses these written agreements for all positions in the company. There is no evidence in the record that Western-Southern uses a contract for the field management consultant position, and Mrs. Taylor's position as an ordinary agent merely involved an amendment to her sales representative's agreement. Fourth, it is unclear whether Western-Southern's use of written agreements for different employment positions is atypical of the industry; i.e., whether other companies are less formal about changes between these positions. Such information would be helpful in determining whether the parties engaged in this industry--companies and employees--viewed occupancy of these various positions as necessarily involving new employment relationships. In light of these lingering questions, we remand this determination to the district court, where the parties and the court will have the opportunity to develop the record further in light of the requirements of Patterson.
 
 
 59
 2. The six-month limitation of actions clause
 
 
 60
 While the district court was not presented with Patterson 's limits on the scope of section 1981, Western-Southern did give the court a solid reason--the six month limitation of actions clause in the Taylors' employment agreements--to dismiss the Taylors' section 1981 claims. In response, the Taylors argued that the limitations clause was either invalid or inapplicable to their section 1981 claims. The district court rejected each of the Taylors' arguments; it found the clauses valid and operative. On appeal, the Taylors renew their two-pronged attack upon the limitations clauses.
 
 
 61
 In reviewing a grant of a motion to dismiss, we assume the truth of all well-pleaded factual allegations, draw all reasonable inferences in favor of the plaintiff, and review de novo the district court's decision. Prince v. Rescorp Realty, 940 F.2d 1104, 1106 (7th Cir.1991); Janowsky v. United States, 913 F.2d 393, 395 (7th Cir.1990); Villegas v. Princeton Farms, Inc., 893 F.2d 919, 924 (7th Cir.1990). A complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-102, 2 L.Ed.2d 80 (1957) (citation omitted).
 
 
 62
 a. the scope of the clause
 
 
 63
 If the district court determines that the promotions sought by the Taylors would constitute a "new and distinct" relation with Western-Southern for the purposes of surviving Patterson, then a separate issue arises: do claims relating to such separate contracts fall within the scope of the limitation agreement contained in the Taylors' existing contracts?[6] Once again, it is helpful to review the language of the limitations clause:
 
 Section III. Legal Proceedings
 You agree:
 
 64
 C. Not to commence any action or suit relating to your employment with Western-Southern more than six months after the date of termination of such employment, and to waive any statute of limitation to the contrary.
 
 
 65
 R.1 Ex.A at 2. The Taylors argue that their section 1981 claims regarding promotion opportunities do not "relate to their employment with Western-Southern" because they are based in part upon Western-Southern's refusal to allow them to enter into new employment contracts. These claims, the Taylors suggest, relate to the wrongful denial of prospective employment rather than wrongful treatment in their current employment.[7]
 
 
 66
 We are persuaded that the clause is ambiguous with respect to promotion claims. On one hand, the phrase "relating to" one's employment can be read broadly to encompass any claim connected with one's affiliation with Western-Southern. On such a reading, the Taylors' failure-to-promote claims fall within the scope of the clause and would be time-barred. On the other hand, the same clause states that such claims must be brought within six-months of "the date of termination of such employment." This suggests that the clause be read narrowly to encompass only claims stemming from one's current employment agreement, not on the defendant's refusal to enter a new one. On this reading, the Taylors' failure-to-promote claims would fall outside the scope of the clause and therefore survive. Thus, if the district court determines that the Taylors' failure-to-promote claims survive Patterson, it must also resolve the ambiguity in the limitations clause with respect to such claims.
 
 
 67
 b. validity of the limitations clause
 
 
 68
 The district court upheld the validity of the six-month limitation of actions clause in the Taylors' contracts. The court relied upon Illinois law, which it determined generally upholds limitation of action clauses in contracts, so long as they are knowingly accepted, reasonable, and not contrary to public policy. The court then found that the limitation of action clauses in this case met these conditions. Accordingly, the court concluded that the limitation of actions clauses were valid. On appeal, the Taylors argue that these limitations clauses are invalid under Illinois law because they are unreasonable and contrary to public policy. Depending upon the district court's resolution of the preceding two issues--surviving Patterson and exceeding the scope of the clause--the validity of the clause may become moot, or it may become the controlling issue. Because it has been fully litigated, we believe it is appropriate for this court to analyze the issue rather than increase the possibility of a second appeal.
 
 
 69
 A preliminary issue not discussed by the district court is whether Illinois law, rather than federal law, should be used to determine the validity of the limitations clause. When Congress fails to provide a statute of limitations for a statutory cause of action such as 42 U.S.C. § 1981, the ordinary procedure is that federal courts borrow the most closely analogous statute of limitations under state law. Reed v. United Transp. Union, 488 U.S. 319, 323-24, 109 S.Ct. 621, 624-25, 102 L.Ed.2d 665 (1989).[8] The Supreme Court has also directed federal courts to look to state law for guidance on "the overtones and details of application of the state limitation period to the federal cause of action." Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 464, 95 S.Ct. 1716, 1722, 44 L.Ed.2d 295 (1975); see also Board of Regents v. Tomanio, 446 U.S. 478, 483-86, 100 S.Ct. 1790, 1794-95, 64 L.Ed.2d 440 (1980); West v. Conrail, 481 U.S. 35, 107 S.Ct. 1538, 95 L.Ed.2d 32 (1987). The Supreme Court has also noted that "considerations of state law may be displaced where their application would be inconsistent with the federal policy underlying the cause of action under consideration." Johnson, 421 U.S. at 465, 95 S.Ct. at 1722; see Tomanio, 446 U.S. at 485, 100 S.Ct. at 1795. Thus, with respect to whether and when the analogous state statute of limitation can be shortened by contract, the district court was correct to look to Illinois law, unless that law would be inconsistent with the federal policy underlying section 1981.
 
 
 70
 As the district court properly concluded, contractual limitations of action are generally upheld under Illinois law. Village of Lake in the Hills v. Illinois Emcasco Ins. Co., 153 Ill.App.3d 815, 106 Ill.Dec. 881, 883, 506 N.E.2d 681, 683 ("Parties to a contract may validly agree to set a reasonable time limit within which a suit on the contract must be filed."), appeal denied, 116 Ill.2d 560, 113 Ill.Dec. 319, 515 N.E.2d 128 (1987).[9] However, such limitations clauses must be (1) knowingly and voluntarily accepted,[10] (2) reasonable,[11] and (3) not inconsistent with public policy.[12]
 
 
 71
 The general federal policy toward limitation of actions clauses is, much like Illinois', focused upon reasonableness and definiteness. In review of a six-month limitation of actions clause in the constitution of a fraternal benefit society, the Supreme Court stated that,
 
 
 72
 in the absence of a controlling statute to the contrary, a provision in a contract may validly limit, between the parties, the time for bringing an action on such contract to a period less than that prescribed in the general statute of limitations, provided that the shorter period itself shall be a reasonable period.
 
 
 73
 Order of United Commercial Travelers of America v. Wolfe, 331 U.S. 586, 608, 67 S.Ct. 1355, 1365, 91 L.Ed. 1687 (1947) (footnote omitted). And, in the context of a business limiting the conditions of actions brought by its customers, in The Majestic, 166 U.S. 375, 386, 17 S.Ct. 597, 602, 41 L.Ed. 1039 (1897), the Supreme Court stated that " 'when a company desires to impose special and most stringent terms upon its customers, in exoneration of its own liability, there is nothing unreasonable in requiring that those terms shall be distinctly declared and deliberately accepted.' " (quoting Henderson v. Stevenson, L.R. 2 H. L. Sc. 470).[13] We note, however, that, even if it were different from the Illinois approach, this general federal policy approving reasonable and definite contractual limitations of action is not so well established, especially in the context of employment contracts, as to constitute a federal rule that must override the application of state law. Cf. West v. Conrail, 481 U.S. 35, 107 S.Ct. 1538, 95 L.Ed.2d 32 (1987) (applicable Federal Rules of Civil Procedure preempt state rule requiring service of the complaint within the limitations period); United States v. Republic Ins. Co., 775 F.2d 156, 158 (6th Cir.1985) ("If there is a federal rule, it must, of course be applied."). We believe that, by enacting section 1981 without a statute of limitations, Congress implied that it is willing to live with a wide range of state statutes and rules governing limitations of action under section 1981. In Cange v. Stotler & Co., 826 F.2d 581 (7th Cir.1987), this court noted a similar policy associated with the private right of action under the Commodity Exchange Act, 7 U.S.C. § 25. We upheld a one-year limitations clause in light of this lack of stated policy to the contrary.
 
 
 74
 Congress' silence on a limitations period for pre-January 11, 1983, causes of action shows its willingness to accept reasonable limitations periods rather than a strong policy in favor of some particular limitations period. Because Congress did not provide an express statute of limitations applicable to this cause of action, allowing the parties to contract for a shorter limitations period than that which would be borrowed from state law is not contrary to public policy, assuming the contracted-for limitations period is reasonable, as is the case here.
 
 
 75
 Id. at 584. Thus, Illinois law on contractual limitations of action is not inconsistent with the federal policy underlying section 1981.
 
 
 76
 Applying Illinois law to the limitation of action clause in the Taylors' contracts, the district court determined, first, that the clause was clearly set forth and voluntarily accepted. R.20 at 3-4. The clause is concisely stated on the first full page of each contract, and the Taylors signed each of these contracts. E.g. R.1 Ex.A, Ex.B, Ex.C. We agree with the district court that, under Illinois law, the limitation of actions clause was understood and accepted by the Taylors.
 
 
 77
 The district court then determined that the clause was reasonable. In support of this conclusion, the court noted that six-month statutes of limitations apply to employees' actions under section 10(b) of the National Labor Relations Act and to hybrid contract and duty-of representation suits under section 301 of the Labor Management Relations Act. DelCostello v. International Bhd. of Teamsters, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). The district court also looked to Myers v. Western-Southern Life Insurance Co., 849 F.2d 259 (6th Cir.1988), in which the Sixth Circuit considered the validity, under Michigan law, of a six-month limitation of actions clause in an insurance agent's employment contract. The plaintiff-appellant in Myers argued that the clause was void as against public policy when applied to his state civil rights claims. The court noted that, with respect to the reasonableness of contractual limitations of action, Michigan law requires " 'that the claimant have sufficient opportunity to investigate and file an action, that the time is not so short as to work a practical abrogation of the right of action, and that the action not be barred before the loss or damage can be ascertained.' " Id. at 262 (quoting Camelot Excavating Co. v. St. Paul Fire & Marine Ins. Co., 410 Mich. 118, 301 N.W.2d 275, 277 (1981)). Under these criteria, the Myers court found the six-month limitations period to be reasonable. Relying upon these cases, the district court found that the six-month limitation clause in the Taylors' contracts satisfied Illinois' reasonableness requirement. Again, we agree with the district court that the six-month limitations clause was reasonable.
 
 
 78
 With respect to public policy, the district court also addressed the Taylors' argument that "if they filed their breach of contract, wrongful discharge, and § 1981 claims within the six-month period, they would be forced to litigate the facts underlying Mr. Taylor's Title VII claim before he was able to receive his right to sue." R.20 at 5. The district court rejected this argument. It noted that Mrs. Taylor's suit would not involve the same underlying facts and that, because "[c]laims are not tried when filed," Mr. Taylor could have filed suit and, by the time it came to trial, he would have received his right to sue letter and could then add his Title VII claim to the suit. Alternatively, the court concluded, Mr. Taylor could have filed suit and asked the court for a stay pending the outcome of his EEOC charge. Thus, the district court concluded that the limitations clause was not contrary to public policy. We agree. Title VII's administrative filing requirements did not impede Mr. Taylor's ability to file suit against Western-Southern on his other claims, and thus Title VII provides no public policy contrary to the six-month limitation of actions clause. In sum, we conclude that the limitation clause is valid under Illinois law, and that Illinois law is not contrary to a federal policy underlying section 1981.
 
 Conclusion
 
 79
 For the foregoing reasons, the district court's judgment in favor of Mr. Taylor on the Title VII claim is affirmed, and the court's dismissal of the Taylors' section 1981 claims is vacated and remanded for further proceedings consistent with this opinion. The Taylors may recover their costs in this court.
 
 
 80
 AFFIRMED IN PART, VACATED AND REMANDED IN PART.
 
 
 
 [1]
 Because the East St. Louis office was a district office, it housed staffs for several areas: East St. Louis, Belleville, O'Fallon, Mascoutah, and others. Tr.I at 74. Mr. Taylor transferred from the Peoria office to the East St. Louis District office and the East St. Louis staff in particular
 
 
 [2]
 Mrs. Taylor was discharged on May 9, 1986, and Mr. Taylor resigned effective February 27, 1987. They filed suit against Western-Southern on June 15, 1988
 
 
 [3]
 In relevant part, Mr. Taylor's EEOC charge read:
 III. I believe I have been discriminated against due to my race, Black, and in an act of retaliation because:
 a. In Nov. 1985 I requested a promotion in writing according to company policy. Mr. Harp (White), District Mgr., held my request in the field office for one month, rather than forwarding it to the home office as per company policy. I am not aware of Harp holding the request of any White employee.
 b. In January, 1986 both my wife (White), also an employee, and I requested relocation to Peoria, IL, where we had been hired. The request was denied. I believe Bobby Sowell (White), requested relocation from Alton, IL to Sikeston, Mo, and it was approved.
 c. On 5/9/86 my wife was forced to resign. In her resignation letter she complained that she had been discriminated against in denial of promotions which had gone to Males, and that she had been denied employment opportunities.
 d. Beginning in about November 1986 and continuing until I felt forced to resign effective 2/27/87 I was continually harassed by Harp by being called into his office and complaints made about my production. My production was one of the highest in the office. Others were not called into Harp's office although some had very low production (both Black and White).
 e. Dennis Morgan (White) submitted his resignation the same day I did. He was contacted the next day and asked to return to work, although he declined. I was not asked to return to work.
 R.1 Ex.C at 3-4.
 
 
 [4]
 See R.34 at 16-21
 
 
 [5]
 Western-Southern also contends that the EEOC charge implies that Mrs. Taylor believed she was discriminated against based upon her sex, rather than her husband's race. But Mr. Taylor listed the events involving Mrs. Taylor on the EEOC charge as examples supporting his contention that he had "been discriminated against due to my race, Black, and in an act of retaliation." R.1 Ex.C at 3-4
 
 
 [6]
 If the district court determines that the sought-after promotions would not involve a "new and distinct" relation, then the Taylors' section 1981 claims would, in addition to not surviving Patterson, certainly fall within the scope of the limitations clause and be thereby time-barred
 
 
 [7]
 The Taylors never presented this argument to the district court, in part because Patterson had not yet been decided and, thus, the limitations clause analysis was not focused upon the promotion claims. As a result, we do not have the benefit of the district court's assessment of the issue. Nonetheless, the Taylors do assert this argument on appeal, and Western-Southern has failed to argue in response that the Taylors waived their right to raise the argument. Western-Southern has thus waived any potential defense of waiver. See McKnight v. General Motors Corp., 908 F.2d 104, 108 (7th Cir.1990)
 
 
 [8]
 In Goodman v. Lukens Steel Co., 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987), the Supreme Court held that, with respect to suits brought under § 1981, federal courts should borrow the relevant state statute of limitations for personal injury actions. See Bailey v. Northern Indiana Pub. Serv. Co., 910 F.2d 406, 412 n. 5 (7th Cir.1990). However, because the Taylors' cause of action accrued prior to Goodman, under Illinois law and this court's decision in Smith v. Firestone Tire and Rubber, 875 F.2d 1325, 1328 (7th Cir.1989), the Taylors would be allowed to pursue their § 1981 claims "within the period first to expire of: (1) five years from the accrual of the cause of action or (2) two years from the decision in Goodman on June 19, 1987." Because the Taylors filed suit on June 15, 1988, their § 1981 claims would be timely but for the limitation of actions clause in their employment contracts
 
 
 [9]
 See 1000 Condominium Ass'n v. Carrier Corp., 180 Ill.App.3d 467, 129 Ill.Dec. 379, 382, 535 N.E.2d 1144, 1147 ("Under Illinois law, a contractual provision that limits the time within which to file a lawsuit is enforceable."), appeal denied, 126 Ill.2d 561, 133 Ill.Dec. 670, 541 N.E.2d 1108 (1989); Wilson v. Indiana Ins. Co., 150 Ill.App.3d 669, 103 Ill.Dec. 922, 924, 502 N.E.2d 69, 71 (1986) ("Illinois case law establishes that insurance policies may validly set forth contractual limitations requiring suit to be brought within a specified period of time."), appeal denied, 114 Ill.2d 559, 108 Ill.Dec. 426, 508 N.E.2d 737 (1987); Western Coal & Dock Co. v. Traders Ins. Co., 122 Ill.App. 138, 140 (1905) ("The validity of a contract between the parties limiting the time within which the action may be brought has been often sustained, and is not questioned here....")
 
 
 [10]
 In Black v. Wabash, St. L. & P. Ry., 111 Ill. 351 (1884), the Illinois Supreme Court considered a contract between a farmer and a railway company concerning a rail shipment of livestock. After the livestock was loaded on the train, and shortly before the train was to depart, an agent of the railway company told the farmer that he had to sign shipping passes. The passes included a clause that required the farmer, as a prerequisite to any claim for damages, to submit a written complaint to the company within five days after the livestock reached their destination. The court stated that, "we have no hesitancy in holding that a stipulation like this, when voluntarily and understandingly entered into by the shipper, is binding upon him." Id. at 357. But the court also noted that if, through "fraud or artifice," the company induced the farmer to sign the passes under the pretense that they were merely for identification and not contracts governing the shipping agreement on the part of the railway company, the limitation would be void. The court remanded for proof on this issue. Id. at 358-59, 361. See also, Wabash R.R. v. Thomas, 222 Ill. 337, 78 N.E. 777, 778 (1906) ("[I]t is well settled in this State that whether the terms of a special agreement limiting the liability of the common carrier was understood and entered into by the consignor and assented to by him is a question of fact."); Illinois Match Co. v. Chicago, R. Isl. & P. Ry., 250 Ill. 396, 95 N.E. 492, 494 (1911) ("[T]he evidence must show that the contract was understandingly entered into by the shipper and its limitations assented to.")
 
 
 [11]
 In Baxter v. Louisville, N. A. & C. Ry., 165 Ill. 78, 45 N.E. 1003 (1897), the Illinois Supreme Court encountered another dispute between a shipper and a railway company regarding a limitation of actions clause. The clause required that, as a precondition to bringing suit against the railway company, the shipper keep his livestock at the place of delivery, segregated from other animals, until written notice was given to an officer of the railway company. The court noted that contractual limitations of action are generally upheld, "provided the time and conditions in the requirement are reasonable." Id. at 1004. Because the court found that it was impractical to keep animals that need feeding and medical care segregated in the stockyard, and it was unclear how a shipper could locate or identify an officer of the company, it ruled the limitation to be unreasonable and void. Id. at 1005. See also Village of Lake in the Hills v. Illinois Emcasco Ins. Co., 153 Ill.App.3d 815, 106 Ill.Dec. 881, 883, 506 N.E.2d 681, 683 (1987) ("Parties to a contract may validly agree to set a reasonable time limit within which a suit on a contract must be filed."); Wabash R.R. v. Thomas, 222 Ill. 337, 78 N.E. 777, 779 (1906) (condition requiring written notice within ten days deemed unreasonable)
 
 
 [12]
 In Burgo v. Illinois Farmers Ins. Co., 8 Ill.App.3d 259, 290 N.E.2d 371 (1972), the appellate court struck down a one-year limitation of actions clause in the uninsured motorist provision of an automobile insurance policy. The court found that the limitation was contrary to the intent of the Illinois legislature as expressed in a statute requiring mandatory uninsured motorist coverage. Because the statute was intended to assure that compensation would be available to motorists injured by uninsured motorists "to at least the same extent compensation is available for injury by a motorist that is insured," id. 290 N.E.2d at 373, the court concluded that the limitations clause was "arbitrary, unreasonable and capricious and against the public policy of this state, and [ ] therefore void." Id. at 374. See also, Severs v. Country Mutual Ins. Co., 89 Ill.2d 515, 61 Ill.Dec. 137, 139, 434 N.E.2d 290, 292 (1982) (striking down a two-year limitation of action clause as applied to a two-year old child as violative of Illinois public policy); Kerouac v. Kerouac, 99 Ill.App.3d 254, 54 Ill.Dec. 678, 684, 425 N.E.2d 543, 549 (1981) (as to minor, "the two-year contractual limitation for suits is void, as contrary to public policy")
 
 
 [13]
 With respect to the validity of a limitation of actions clause in a contract between a general contractor and a subcontractor, this court stated that "[i]t is a well-settled principle of law that parties to a contract may stipulate the time in which proceedings must be commenced in order to enforce claims arising from that contract." Hartford Accident & Indem. Co. v. Heftler Constr. Co., 325 F.2d 107, 108 (7th Cir.1963) (citing Wolfe ). More specifically, this court found that the terms of the clause were definite, the limitations period of ten months was reasonable, and, thus, the limitation was enforceable. Id. at 108-09. See also Practical Constr. Co. v. Granite City Hous. Auth., 416 F.2d 540, 544 (7th Cir.1969) (upholding 120-day limitation period in construction contract). But see Silvestri v. Italia S.p.A. Di Navigazione, 388 F.2d 11, 17-18 (2d Cir.1968) (reversing summary judgment based upon one-year limitation of actions clause in small print on ship passenger ticket because the passenger was not reasonably notified of the provision)